## SOUTHWEST MISSOURI LIGHT CO. v. CITY OF JOPLIN, MO.

(Circuit Court, W. D. Missouri, W. D. March 31, 1900.)

1. CONSTITUTIONAL LAW — IMPAIRMENT OF OBLIGATION OF CONTRACTS — CITY ORDINANCE.

   An ordinance adopted by a city under assumed authority from the state which impairs the obligation of a previous contract made by the city is the same in effect as a subsequent enactment by the state legislature, and is within the prohibition of the contract clause of the federal constitution.

2. MUNICIPAL CORPORATIONS—CONTRACTS—ORDINANCE GRANTING FRANCHISE TO LIGHT COMPANY.

   A statute of Missouri (Laws 1891, p. 60) authorizes cities of the third class to erect, maintain, and operate gas or electric light works or water

works, to supply light or water for public purposes, and for the use of the inhabitants of such city: "provided, that the council may, in their discretion, grant the right to any person or persons or corporation to erect such works * * * upon such terms as may be prescribed by ordinance: provided, further, that such right to such persons or corporation shall not extend for a longer period than 20 years, and shall not be renewed unless by the consent of a majority of the qualified voters." , Acting under such statute a city passed an ordinance by which, "in consideration of benefits to be derived therefrom," it granted to the assignors of a corporation the right to erect, maintain, and operate electric light works for a, term of 20 years, with such incidental rights as were necessary for the efficient operation of such works. The ordinance required the grantees to complete the works within a specified time; to erect poles to properly suspend street lights, if contracted for at any time by the city; to maintain a light at a railroad crossing, free of expense to the city; and fixed the limit of rates to be charged for lights. *Held* that, having adopted the alternative method of procuring light for the city and its inhabitants contemplated by the statute, it was an implied term of the contract, made by the acceptance of the ordinance, that the city would not itself enter into competition with the grantee in supplying lights to private consumers during the term of the grant by means of a light plant erected under the powers conferred by the statute.

3. SAME—IMPAIRMENT OF CONTRACT—INJUNCTION.
Where a city, having erected an electric light plant under an ordinance adopted pursuant to a vote, is proceeding to furnish lights to private consumers, in competition with a private corporation, and in violation of the implied terms of the franchise granted to such corporation, under which it had expended money in building works, the latter is entitled to an injunction against such competition as the only adequate remedy; and it is not precluded from such relief by the fact that it did not object to the erection of the works by the city, when the ordinance under which they were built did not disclose any intention on the part of the city to compete for private business, and no injunction is asked against the furnishing by the city of lights for public purposes.

In Equity. On motion for temporary injunction.

Edwin Silver, for complainant.
C. H. Montgomery, for defendant.

PHILIPS, District Judge. This is a bill in equity to enjoin the defendant, a municipal corporation under the laws of the state of Missouri, from proceeding further in the operation of works constructed by it for the purpose of furnishing electric lights in so far as it is furnishing and proposes to continue to furnish private consumers for commercial purposes. In 1891 the legislature of the state passed an act (Laws Mo. 1891, p. 60) the fourth section of which is as follows:

"Sec. 1519. The council shall have the right to erect, maintain and operate gas-works, electric light works or light works of any other kind or name, and to erect lamp posts, electric light poles or any other machinery or appliances necessary to light the streets, avenues, alleys and other public places, and to supply private lights for the use of the inhabitants of the city and its suburbs, and regulate the same and to prescribe and regulate the rates to be paid by the consumers thereof, and to acquire by purchase, donation, or condemnation, suitable ground within or without the city upon which to erect such works, and the right of way to and from said works, and also the right of way for laying gas pipes, electric wires under or above ground, and erecting posts and poles and such other machinery and appliances as may be necessary for the efficient operation of such works; all of which shall be done in the manner prescribed by ordinance: provided, that the council may, in their discretion, grant the right to any person or persons or corporation to erect

such works and lay the pipes, wires, and erect the posts, poles and other necessary appliances and machinery therefor, upon such terms as may be prescribed by ordinance: provided, further, that such right to such persons or corporation shall not extend for a longer period than twenty years, and shall not be renewed unless by the consent of a majority of the qualified voters of said city voting at an election held for such purpose."

The succeeding section makes a like provision for erecting water-works, either by the city or by contract with some person or corporation. Afterwards, on the 7th day of October, 1891, the defendant city adopted an ordinance by which, "in consideration of benefits to be derived therefrom," it granted to certain designated persons the right, power, privilege, and authority within said city, and any additions thereto, to build, erect, operate, and maintain all necessary and convenient electric light and electric motor plants, appliances, machinery, and appurtenances for the generation of electricity, with proper means for maintaining conduits for the distribution of such electricity, for the purpose of furnishing light, heat, motor power, and other purposes, for a period of 20 years from the granting of the franchise; giving authority to use the streets, avenues, alleys, and public grounds in the city for laying pipes and erecting poles and other proper supports, and to suspend wires thereon, for the purpose aforesaid. After imposing certain conditions under which the privilege should be exercised, the ordinance fixed the limitation for charges to be allowed for furnishing such lights. This grant inured to the benefit of the assignees of the grantees, which right passed by assignment to the complainant corporation. The ordinance was accepted, and the grantees thereunder proceeded, at an outlay of $15,000, to erect said works and appliances for furnishing to the city and the people thereof electric lights. The complainant thereafter continued to operate said plant, furnishing lights to the city and residents thereof and its vicinity, up to the date of the filing of the bill herein, in full compliance with the requirements of the ordinance. On the 7th day of February, 1899, the defendant city passed an ordinance authorizing and calling a special election for the purpose of voting on the proposition to increase the indebtedness of the city of Joplin for the purpose of building an electric light plant to be owned, controlled, and operated by the city, authorizing the council to issue bonds therefor, and providing for a sinking fund. An election thereunder was held, and the proposition submitted was carried. On the 1st day of March, 1899, the city, by its council, adopted an ordinance declaring the result of the election, and authorizing the issue of $30,000 in bonds for the purpose of erecting its own electric light works, which have been constructed and put into operation. The bill does not seek to enjoin the city from furnishing such lights for public uses, but alleges that by the erection of such works and doing a commercial business in furnishing lights to private consumers it is entering into competition with the franchise granted to the complainant, the practical effect of which is to threaten to destroy the value of its plant by driving it out of business. The bill alleges that the complainant is the owner of a large amount of property in said city (presumably its electric plant), which will be subjected to the payment of taxes thereon to aid in supporting the works constructed and operated by the city, and that it will there-

by be compelled to contribute to the destruction of its own business. The claim is that such act of the city impairs the obligation of its contract with the complainant, and is, therefore, prohibited by section 10 of article 1 of the federal constitution, which declares that no state shall pass any law impairing the obligation of contracts.

It is to be conceded to the contention of complainant that the subsequent adoption of the ordinance by the city under an assumed authority from the state has the same effect upon the pre-existing contract as a subsequent enactment by the legislature of the state. City of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341. The principal contention of defendant is that the ordinance of October 7, 1891, merely granted the right or privilege to the use of its streets, avenues, alleys, etc., for laying conduits, erecting poles, and stringing wires thereon necessary for the operation of complainant's works in the distribution of electricity; that it left the city perfectly free either to concede a like right to any other private person or corporation, or immediately to erect its own plant, and furnish lights, either for public or private use, within the city limits. If the grant under the ordinance was merely a unilateral contract, imposing no mutual obligations and undertakings between the parties, to be kept and observed by them during the life of the franchise, it might well be maintained that it was the mere grant of the privilege to erect and maintain, as best it might, within the city, such works, with no express or implied undertaking on the part of the city not to become such competitor. There is no better rule for the construction of grants and contracts than "to place ourselves as nearly as possible in the seats which were occupied by the parties at the time the instrument was executed; then, taking it by the four corners, read it." Walsh v. Hill, 38 Cal. 481. Accordingly, it was said by the court of appeals for this circuit in Speed v. Railroad Co., 30 C. C. A. 3, 86 Fed. 237:

"It may be regarded as the recognized rule that in the exposition of grants and contracts the construction should be upon the view of the attitude of the persons making them, and upon a comparison of every part of the entire instrument; so that, while endeavoring to give every substantive part operative effect, also to give it a practical rather than a theoretical application. And when the intention is apparent, without repugnance to the settled rules of law, it will control the technical terms; for the intention, and not the words, is the sense of any agreement. And this will prevail regardless of inapt expressions or careless recitations."

It is a well-known public fact that in this state in 1890–91 there existed in cities of the third class the ambition and desire to enjoy the advantages and conveniences of modern civilization in having waterworks, gas, and electric lights, both for public and private use. Many of these municipalities were already burdened with public debt to the full extent of the constitutional limit of taxation. In others there was timidity, to immovability, about issuing bonds to enable such cities to embark in the experiment of building and operating such works. To meet these conditions, the act of 1891, supra, was passed by the state legislature, the fourth section of which provided for gas and electric light works, and the fifth section provided for waterworks for the city. The first part of said fourth section author-

ized the city to erect, maintain, and operate electric light works "necessary to light the streets, avenues, alleys and other public places, and to supply private lights for the use of the inhabitants of the city and suburbs, and regulate the same," and it prescribed and regulated the rates to be paid by consumers thereof, etc.; and to provide for the condition above adverted to, where the city might not be able to erect and maintain its own works, follows the proviso authorizing the council, in the exercise of their discretion, to "grant the right to any person or persons or corporation to erect such works." The right to erect such works was for the purpose of giving the city and its inhabitants the facilities for obtaining such lights. When it, by such contract, obtained these advantages for the given period of 20 years, the city had accomplished through this legislation the desired object. The opening words of section 1 of the ordinance indicate this: "In consideration of the benefits to be derived therefrom," the persons named, and their assigns and successors, were authorized to erect such works; that is, the consideration of the benefits to be derived from such contract to the city and its inhabitants justified the grant. The last clause of the same section, which imposed upon the company the duty of erecting poles for lights, so as "to properly suspend street lights, if contracted for at any time by the city," shows that by the ordinance, if the city elected to contract for such street lights, the duty was imposed upon the grantees to erect poles, and properly to suspend therefrom such lights. And as long as the complainant exercises such grant, it must furnish this equipment for the suspension of street lights for the city's use. So, also, under the third section of the ordinance, which fixes the maximum rate that the company may charge for such lights, occurs this provision:

"For one light erected on the front porch of Freeman's Foundry, so as to light the Frisco Railroad crossing on Main street, and to be maintained and kept in order without charge or expense to the city."

By this provision the contract compels the company to maintain and keep in order, without charge or expense to the city, an electric light at a given place for a given purpose, during the period of 20 years, whether or not the city erects and operates its own works. The purpose of the city in making this contract to secure such lights for the public and the people of the city is further indicated by the provision in section 5 of the ordinance that, "unless said parties, their successors, or assigns, shall begin work in good faith within sixty days from the approval of this ordinance, and have the works in operation within four months, this ordinance shall be void and of no effect." It would have been quite a matter of indifference to the city when the work should be begun and the works put in operation, if it did not understand that the same was for the benefit of the city and its inhabitants; and, if these grantees did not thus get to work, and complete the works, so the city could get the use thereof, it intended by this provision to be at liberty to contract with some other person or corporation therefor. And certainly it must follow that when the company thus began work and completed it, the obligation was imposed upon the city not to interfere with the right and privilege granted to furnish such lights to the people of the city.

It is among the recognized canons of construction of statutes, contracts, and grants that what is implied is as much a part of it as if expressed in so many words. U. S. v. Babbitt, 1 Black, 61, 17 L. Ed. 94. The rule is thus expressed in 2 Kent, Comm. (12th Ed.) § 555:

"The mutual intention of the parties to the instrument is the great, and sometimes the difficult, object of the inquiry, when the terms of it are not free from ambiguity. To reach and carry that intention into effect, the law, when it becomes necessary, will control even the literal terms of the contract, if they manifestly contravene the purpose; and many cases are given in the books in which the plain intent has prevailed over the strict letter of the contract. * * * The whole instrument is to be viewed and compared in all its parts, so that every part of it may be made consistent and effectual."

So Bishop (Cont. § 256) says:

"It is the interpreted stipulation, not its naked words, which, in trial of a cause, the judge submits to the jury as the foundation for their verdict. * * * The contract as shaped, or as to be shaped, by judicial hands is the real undertaking between the parties, and the written or spoken words fill simply the office of helps to the tribunal in determining the contract."

This principle is graphically expressed in Plowd. 467:

"Hence it appears that there is great diversity between these two equities. The one abridges the letter, the other enlarges it; the one diminishes it, the other amplifies it; the one takes from the letter, the other adds to it. So that a man ought not to rest upon the letter only, but he ought to rely upon the sense, which is tempered and guided by equity, and therein he reaps the fruit of the law; for, as a nut consists of a shell and kernel, so every statute consists of the letter and the sense; and as the kernel is the fruit of the nut, so the sense is the fruit of the statute."

There is another rule of law applicable to this case:

"If the act to be done by the party binding can only be done upon a corresponding act being done or allowed by the other party, an obligation of the latter to do or allow to be done the act or thing necessary for the completion of the contract will be necessarily implied." Black v. Woodrow, 39 Md. 194; U. S. v. Speed, 8 Wall. 77, 19 L. Ed. 449.

This rule is very aptly put by Judge Wagner in Lewis v. Insurance Co., 61 Mo. 538:

"It very frequently happens that contracts on their face and by their express terms appear to be obligatory on one party only; but in such cases, if it be manifest that it was the intention of the parties, and the consideration upon which one party assumed an express obligation, that there should be a corresponding and correlative obligation on the other party, such corresponding and correlative obligation will be implied,—as, if the act to be done by the party binding himself can only be done upon a corresponding act being done or allowed by the other party, an obligation by the latter to do or allow to be done the act or things necessary for the completion of the contract will be necessarily implied."

When the city granted this right and privilege to erect such works, and to furnish lights for a period of 20 years, can it be possible that the city contemplated, and that the parties understood, that, after the grantees should go to the large expense of erecting such works, the city would, at its pleasure, construct like works, to occupy the same field as a competitor with the grantees? In Cort v. Lassard, 18 Or. 221, 22 Pac. 1054, 6 L. R. A. 653, the court, speaking of a contract binding an actor to act at a particular theater for a specified time, declared that:

"In the nature of things, it implies a regulation against acting at any other theater during that time. * * * According to the true spirit of such agreement, the implication precluding the defendant from acting at any other theater during the period for which he has agreed to act for plaintiff follows as inevitably and logically as if it was expressed."

The question presented here has nowhere been more fully discussed than by the supreme court of Pennsylvania in the case of White v. City of Meadville, 35 Atl. 694, 177 Pa. St. 643, 34 L. R. A. 567. The city, after making a contract with the water company for the erection of a water plant, attempted subsequently to build its own plant under a later statute; and the court, in this connection, made an observation most pertinent to the facts of this case:

"A municipality, in its beginning, is perhaps not financially strong, or its debt may approach the constitutional limit so closely that it cannot borrow. Nevertheless, the low state of its financial condition does not render less urgent the necessity of a water supply. It can obtain it in but one way: by contract with those who have the money, and are willing to invest their private capital in the construction of waterworks. The legislature knew that capital would not be invested in such enterprises if, in the future, it were liable to confiscation by competition with a public enterprise operated from a municipal treasury capable of replenishment from the pocket of the taxpayer. The municipality will not be forever poor. The time will come when it will be of financial ability to own and operate its own works. That fact suggested clause 7 of the corporation act [which conferred the power to buy]. The very fact of having a supply of water on an investment of private capital has tended to stimulate its growth, and largely appreciate the value of taxable property. Both the contracting parties must be conclusively presumed to have had in view the law which empowered them to contract, and which became a part of the contract. At the end of 20 years the defendants have a right to take the works at a price fixed by the law, and that is one of computation. True, as to the city, the taking of the works is only permissive."

This case was followed in Metzger v. Borough of Beaver Falls, 35 Atl. 1134, 178 Pa. St. 1, in which the court said:

"The legislature never intended to commit the duty of supplying water to a municipality to two different agencies, both in operation at the same time. The borough had authority 'to provide a supply of water for the use of the inhabitants.' This supply was provided by the Union Water Company, subject to such regulations in regard to streets, roads, and grades as the borough imposed. The borough did not attempt to construct works until years after the water company had laid its mains and the public had been served. The rights of the water company vested by consent of the municipality, and its contract to supply water for public purposes. * * * After twenty years the borough has power to purchase the works at a price not exorbitant."

The court held that the city could not, by constructing its own works within 20 years, without buying out the company, become a competitor with the company, and drive it out of business. After the decision in the Meadville Case, the city attempted to evade the decision of the supreme court by the subterfuge stated in Welsh v. Borough of Beaver Falls, 40 Atl. 784, 186 Pa. St. 578. The court held that what could not be done directly could not be done indirectly, and said:

"When a contract is made with a private water company, authorized usually only to build its works and maintain its plant at one place, it would be grossly inequitable to hold that the municipality, after inviting the construction of such works, and contracting with the company for the water supply, could at any time thereafter destroy them by constructing its own works. To author-

ize such municipal action, the statutory right must be explicit. It will not be implied from doubtful language."

This question was very carefully considered by Judge Carpenter in Westerly Waterworks Co. v. Town of Westerly (C. C.) 75 Fed. 181. It is true that in that case it may be said there was something of an express obligation on the part of the water company to supply water, and there was something of an exclusive grant, with the right of the city to purchase within 25 years. But what difference, in contemplation of law, can it make whether, under a statute like that of Missouri, where the option is given to the city either to build its own works or to contract with some other person or corporation to build such works for the purpose of supplying the city and its inhabitants, under which the implication necessarily arises that the city should not become a competitor by erecting its own works, and an express provision in the ordinance to that effect? The court in the case last cited said:

"The question is whether the contract here in dispute contains an implicit reservation, founded on the then existing state of the law, of a right of a town at pleasure to construct waterworks. The law gives power to construct waterworks, and also to contract for a water supply, and, as incidental to such contracts, to confer certain rights and exemptions on the contractors. Does this leave it competent for the town to make a contract with this corporation, and afterwards, without any default alleged on the part of the corporation, and in derogation of the terms of the contract, to construct other works? The question is not whether the town may grant a franchise to be exclusively exercised by the company for a term of years, without regard to its ability or willingness to furnish an adequate supply of suitable water; but the question is, rather, whether the town has not, by its own act, under one branch of the law, limited its power to act under the other branch of the act."

Without undertaking to review or reconcile some apparent conflict of authority on this subject, I am unable to differentiate this case from the governing principle ruled by the supreme court in City of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341. The charter of the city of Walla Walla empowered it to erect and maintain waterworks, or to authorize the erection of the same, "for the purpose of furnishing the city, or the inhabitants thereof, with a sufficient supply of water." And by another section the city was empowered to provide a sufficient supply of water, and "to grant the right to use the streets of the city for the purpose of laying gas and other pipes, intended to furnish the inhabitants of the city with light or water, to any person or association of persons, for a term not exceeding 25 years; provided, always, that none of the rights or privileges shall be exclusive, nor prevent the council from granting the same right to others." Under this statute the city, by ordinance, granted to the water company the right to lay and maintain water mains, etc., for 25 years, reserving to itself the right to maintain fire hydrants and to flush sewers during this term, each without charge. The contract further provided that it was voidable by the city so far as it required the payment of money upon the judgment of a court of competent jurisdiction, when there should be a substantial failure of the supply of water, or failure of the company to perform its undertaking. The provisions of the ordinance were accepted by the water company, and the works were erected, and the company for a number of years supplied the requisite water, and performed its contract.

Then the city passed an ordinance to construct its own system of waterworks, and to issue bonds therefor. Thereupon the water company filed its bill to enjoin the city. It is true that in that case the ordinance creating the contract between the city and the water company undertook to give the company the exclusive right to furnish water. And while it might seem, on a casual reading of the opinion of the court, that this fact had some influence on its judgment, enjoining the city from becoming a competitor with the water company, yet a closer analysis of the opinion satisfies my mind that this fact could not have been of controlling effect. Such a provision in the contract, being in express violation of the grant under the state statute to the city, the statute read the provision out of the contract, and therefore the case necessarily was determined without regard to such provision. This case decides expressly that the subsequent ordinance of the city brought the case within the purview of that clause of section 10 of article 1 of the federal constitution which prohibits a state from passing any law impairing the obligation of contracts. The municipality being an integral part of the state, its legislative act in the form of an ordinance under an assumed authority from the state operated upon the previous contract the same as if it had been a subsequent act of the state legislature. The court said:

"Had the privilege granted been an exclusive one, the contract might be considered objectionable upon the ground that it created a monopoly, without an express sanction of the legislature to that effect."

It then further proceeded to hold:

"That an ordinance granting the right to the water company for twenty-five years to lay and maintain water pipes for the purpose of furnishing the inhabitants of the city with water does not, in our opinion, create a monopoly or prevent the granting of a similar franchise to another company."

And as conclusive proof that the court did not base its conclusion upon the provision in the contract giving the company the exclusive right for the designated period, on page 17, 172 U. S., page 84, 19 Sup. Ct., and page 348, 43 L. Ed., the court says:

"There was no attempt made to create a monopoly by granting an exclusive right to this company, and the agreement that the city would not erect waterworks of its own was accompanied, in section 8 of the contract, with a reservation of a right to take, condemn, and pay for the waterworks of the company at any time during the existence of the contract. Taking sections 7 and 8 together, they amount simply to this: That, if the city should desire to establish waterworks of its own, it would do so by condemning the property of the company, and making such changes in its plant, or such additions thereto, as it might deem desirable for the better supply of its inhabitants; but that it would not enter into a direct competition with the company during the life of the contract. As such competition would be almost necessarily ruinous to the company, it was little more than an agreement that the city would carry out the contract in good faith. An agreement of this kind was a natural incident to the main purpose of the contract, to the power given to the city by its charter to provide a sufficient supply of water, and to grant the right to use the streets of the city for the purpose of laying water pipes to any person or association of persons for a term not exceeding twenty-five years. In establishing a system of waterworks the company would necessarily incur a large expense in the construction of the power house and the laying of its pipes through the streets, and, as the life of the contract was limited to twenty-five years, it would naturally desire to protect itself from competition as far as possible, and would have a right to expect that at least the city would not

itself enter into such competition. It is not to be supposed that the company would have entered upon this large undertaking in view of the possibility that in one of the sudden changes of public opinion, to which all municipalities are more or less subject, the city might resolve to enter the field itself,—a field in which it undoubtedly would have become the master,—and practically extinguish the rights it had already granted to the company. We think a disclaimer of this kind was within the fair intendment of the contract, and that a stipulation to that effect was such a one as the city might lawfully make as an incident of the principal undertaking."

In other words, such an express provision in the contract, in good conscience and equity, could amount to nothing more than what the law would write into a contract made by a city of the third class in Missouri under this statute of 1891. The city of Joplin, "in consideration of the benefits to be derived" from the construction and erection of the plant by its grantees, gave them the right and privilege to its streets, etc. It compelled them to go to work within a given number of days, and to complete its works within a given time; to so erect its poles and string its wires as to furnish the streets of the city with electric lights if the city should demand a contract therefor; it required of the company to keep and maintain a light at a given place for lighting a railroad crossing; it invited the company to put its money into this plant, and to become the owner of property in the city. Will the law permit that, as soon as it becomes strong enough to stand alone, because, perhaps, the very presence of electric lights on the streets and in its houses, furnished by this complainant, has invited population and growth and increase of its wealth, the city itself should embark in the electric light business, lay its pipes alongside of those of the complainant, and enter the field of competition in the mercantile business of selling lights, and to tax the property of the complainant to help to support this competition, and ultimately drive it from the field, and destroy its investment? When it exercised its option, under the statute of 1891, to enter into a contract with some other person or corporation for a period of 20 years, it thereby as effectually declared to its grantee that it did not propose to exercise contemporaneously the power given in the first part of the statute to erect its own works, and enter upon competition with its grantees, as if it had written it in italics in the ordinance itself. What is necessarily implied need not be expressed. My conclusion in this case is based largely upon the peculiar provisions of this statute, the object of the legislature in its grant to cities of the third class, as well as the obvious equities and justice of the case. As the complainant does not ask that the defendant shall not supply for its public use electric lights, it certainly ought not to complain that it shall be restrained from entering the field of speculation in a business venture to compete for private patronage.

The remaining question of importance is, will the remedy of injunction apply to the facts of this case? Doubtless, where the grantee from the city should stand by silently, and see the city proceed to erect its own plant, with the knowledge of the fact that it was entering into competition in its operation with the grantee in every respect, at an outlay of a large amount of money in the issue and sale of bonds, good conscience would demand that the objector should speak out,

and take affirmative action at the earliest time possible. But each case must depend largely upon its own peculiar facts. The ordinance under which the city built its works simply provided "to increase the indebtedness of the city of Joplin for the purpose of building an electric light plant, to be owned, controlled, and operated by the city." There was nothing in this ordinance declaring to the public the purpose of the city to do more than build an electric light plant, to be owned and operated for the public uses of the city. There was nothing on the face of the ordinance to communicate that it was the further purpose of the city to operate its plant for mercantile purposes. The complainant is not objecting to the construction and operation of the defendant's works in supplying electricity for its public use, but for extending that use to competition in the open market. The purpose of the city to enter into this competition was not made manifest to the complainant until the defendant began to furnish lights to private consumers, which is now in its incipiency. Has the complainant, for such invasion of its rights, a complete remedy at law within the meaning of the statute? "The remedy at law, in order to exclude the concurrent remedy at equity, must be as complete, as practical, and as efficient to the ends of justice and its prompt administration as the remedy in equity." City of Walla Walla v. Walla Walla Water Co., 172 U. S. 12, 19 Sup. Ct. 82, 43 L. Ed. 346. The court in this same case, speaking of the remedy at law for the breach of the covenant, says:

"In the meantime great—perhaps irreparable—damage would have been done to the plaintiff. What the measure of such damages was would be exceedingly difficult of ascertainment, and would depend largely upon the question of whether the value of plaintiff's plant was destroyed or merely impaired. It would be impossible to say what would be the damage incurred at any particular moment, since such damage might be more or less dependent upon whether the competition of the city should ultimately destroy, or only interfere with, the business of the complainant."

Could the complainant's damages in a suit at law be ascertained in a single suit? How would it be possible for a court and jury to fix a reliant and just standard for the ascertainment of all damages the complainant would sustain, dependent upon future events and results impossible of anticipation? Must it sue every day, or every month, or must it wait until the fact is actually demonstrated by experiment that its property and business have been wholly destroyed, or could the court and jury take the results of a preceding period of competition, and by that measure the results for the future? It seems to me that this is the proper office of the remedial justice sought by the process of injunction. Temporary injunction granted.