## LOS ANGELES CITY WATER CO. v. CITY OF LOS ANGELES.

(Circuit Court, S. D. California. August 13, 1900.)

No. 954.

1. FEDERAL COURTS—JURISDICTION—CONSTITUTIONAL QUESTIONS.

A federal court has jurisdiction of a suit by a water company to enjoin the enforcement of a municipal ordinance fixing rates of charge for water, on the ground that it impairs the obligation of a contract between the city and the company, although the contract, as set out in the bill, expired by its terms prior to the passage of the ordinance. where it is alleged to be still in force.

2. MUNICIPAL CORPORATIONS—CONTRACT WITH WATER COMPANY—TERMINATION.

Under a contract with a city to reconstruct its water works and operate the same for a term of 30 years, a water company during the term practically constructed an entirely new and greatly enlarged plant, increasing the distributing system from one having 6 miles of wooden pipes to one with 320 miles of iron pipes. The contract required the company to furnish water free for all municipal, fire, and school purposes, and to supply the inhabitants of the city with water for domestic purposes at rates not exceeding those therein fixed, and for that purpose to make all reasonable extensions of its system. It further provided that at the end of the term the plant should be returned to the city, which should pay the value of all improvements made therein; the amount to be agreed upon or fixed by arbitrators. At the expiration of the term the city did not pay or tender the value of such improvements. which had not been agreed upon or satisfactorily determined; but it continued to require the company to make extensions, and to furnish water free for public uses, the same as before. *Held*, that so long as the company complied with such requirements, and until the city terminated the contract by making or tendering the required payment, its provisions for the benefit of the company remained in force, and the city could not, without unconstitutionally impairing its obligation, reduce the rates which the company was thereby authorized to charge for water supplied to private consumers.

3. INJUNCTION—GROUNDS.

A water company is entitled to an injunction to restrain a city from enforcing an ordinance reducing its rates of charge in impairment of a contract, and subjecting the company and its officers and employés to penal actions for its violation, and also to restrain private persons from instituting threatened prosecutions under such ordinance.

In Equity. On exceptions and demurrers to original and supplemental bills.

J. S. Chapman, John Garber, and Stephen M. White, for complainant.

Walter F. Haas and Lee & Scott, for defendant.

ROSS, Circuit Judge. This is a suit in equity, the chief object of which is the annulment of an ordinance adopted by the defendant city on the 26th day of February, 1900, establishing the rates at which the complainant shall furnish water to its consumers. To the bill certain exceptions were filed by the defendant, as, also, a demurrer. Subsequently a supplemental bill was filed by the complainant, to which certain consumers of the water within the city were also made parties; and they, together with the defendant city, filed certain exceptions to the supplemental bill, as well as a demurrer thereto. The case now comes before the court on these

pleadings. A similar ordinance adopted by the defendant city in February, 1897, was attacked by the complainant in a suit tried in this court before Judge Wellborn, and resulted in a decree annulling the ordinance on the ground that the rates so established were lower than those provided for by a contract entered into on the 22d day of July, 1868, by and between the defendant city, then known as the "Mayor and Common Council of the City of Los Angeles," on the one part, and John S. Griffin, Prudent Beaudry, and Solomon Lazard, on the other part, to whose rights and obligations under the contract the complainant company almost immediately thereafter succeeded. (C. C.) 88 Fed. 720. On appeal that decree was affirmed by the supreme court. 177 U. S. 558, 20 Sup. Ct. 736, 44 L. Ed. ——. Each of the opinions in that case shows that the validity and effect of the contract of 1868 were carefully considered, and the result of that litigation is plainly conclusive against the validity of the similar ordinance of February 26, 1900, now in question, if the provision of the contract of 1868 to the effect that the city shall not reduce the water rates below those then charged continues in force. On the part of the city it is denied that that provision of the contract in 1868 was in force at the time of the commencement of this suit, and that is the principal question in the present case. The demurrers, of course, confess the truth of all facts properly alleged in the original and supplemental bills. From these it appears that in August, 1865, the city of Los Angeles, through its then mayor and common council, thereto authorized by ordinance, entered into a contract with one Jean Louis Sainsevaine, by which the city leased to Sainsevaine "'the public water works of Los Angeles City,' so called, with all and singular the rights of way and water, easements, wheels, flumes, pipes, canals, reservoirs, and appurtenances thereunto belonging and appertaining, with the further right to build necessary and suitable reservoirs on vacant city lands for use in connection with said water works, and with the further right to sell and distribute water through, by, and from said works for the benefit of the said Sainsevaine" for the period of four years from February 8, 1865, with the privilege on his part to continue the agreement and lease for the further period of six years after the expiration of the four years, he giving written notice to the city of his intention to avail himself of the extension at least three months before the expiration of the original term. The obligations imposed on Sainsevaine by that instrument, and by him assumed, were: (1) To give a bond in a specified amount for the faithful performance of the contract on his part. (2) To pay to the city, as rent of the leased property and privileges, $1,000 yearly, in quarterly installments of $250 each. (3) To supply the city, so far as pipes "have been or shall be laid," with pure, fresh drinking water for all domestic purposes, and to keep constantly on hand, in reservoir or reservoirs, a sufficiency of such water for a 30-days supply for those purposes. (4) To replace or repair such of the pipes as should burst or leak, as soon as practicable. (5) To pay all the costs of repairs, enlargements, extensions, and preservations of the water works and appurtenances. (6) To furnish water free of charge to

the public school houses in the city and to city hospitals, "where the same are adjacent to such works and any line of pipe," and also for the irrigation of trees and shrubbery in the lots of school houses and in the public plaza; and to furnish water in cases of fire free of charge, whether the conflagration be of public or private property. (7) In no case to interfere with the general irrigation of the city from the public zanja, nor with the laws and ordinances governing the same. (8) In case of the extension of the lease for the additional term of six years, to execute to the city a new bond for his faithful performance of the agreement. (9) Upon the expiration of the agreement, or its continuance, as the case should be, to surrender or deliver to the city peaceable possession of the water works, rights of way, water, pipes, flumes, machinery, wheels, canals, keys, and other appurtenances thereunto belonging, including all enlargements, extensions, alterations, and additions made thereon or thereto during the tenancy, in good order and condition, reasonable use and wear excepted, and free of all debt, charges, and incumbrances. The lease also contained on the part of the city a concession to the lessee of the right to lay pipe underground in all the public streets of the city, and of taking them up when necessary, and the further covenant on the part of the city not to grant any franchise to any other person or corporation for similar purposes. In July, 1868, the contract which forms the basis of the present suit was executed; the Sainsevaine lease having been previously surrendered and canceled. It bears date July 20, 1868, but was not executed until the 22d day of that month, at which time it was authorized and confirmed by an ordinance of the city. The water works therein referred to consisted at that time of a water wheel placed in the Zanja Madre, below the point of its diversion of water from the Los Angeles river, which wheel was used for lifting the water from the zanja into a wooden flume, by which it was conducted to a pipe system consisting of about six miles of wooden pipe, which had been laid in the streets of the city, and from which the then population of about 5,000 people received water for domestic purposes. The contract of 1868 is as follows:

"This agreement, made and entered into this the 20th day of July, A. D. 1868, between the corporation known as the 'Mayor and Common Council of the City of Los Angeles,' and their successors in office, for and on behalf of said city of Los Angeles, party of the first part, and John S. Griffin, Prudent Beaudry, and Solomon Lazard, residents of the city and county of Los Angeles, state of California, party of the second part, witnesseth: That for and in consideration of the yearly payment of one thousand five hundred dollars per annum in gold coin, such payments to be made upon the first day of January of each year, after the signing and approval of this ordinance and contract, until the conclusion of the term of this contract, and the further consideration that the said parties of the second part will surrender to the said party of the first part and cancel all claims they now hold against said city for repairs of said water works and for damages, amounting to the sum of eight thousand dollars, a little more or less, and for the further consideration that the said parties of the second part shall make the following improvements about, in, and upon the said water works at their own proper cost and expenses, to wit: Lay down in streets of said city twelve miles of iron pipes of sufficient capacity to supply the inhabitants of said city with water for domestic purposes, and shall erect, or cause to be erected, one hydrant, to be used as a protection

against fire, at one corner of each cross street of said city, where the water pipes now are or may hereafter be laid by virtue of this contract, and shall, within one year from the approval of this contract and ordinance, erect or cause to be erected an ornamental fountain upon the public plaza of said city, of such design as the mayor and common council shall direct, at a cost not to exceed one thousand dollars, and shall, within two years from the approval of this contract and ordinance, construct, at their own expense, such ditches, flumes, or erect such machinery, in connection with said water works, as will secure to the inhabitants of said city a constant supply of water for domestic purposes, and shall construct reservoirs of sufficient capacity for that purpose. The said party of the first part, for the above consideration, and one dollar in hand paid, the receipt whereof is hereby acknowledged, hereby covenants and agrees with the said party of the second part, their heirs, executors, administrators, or assigns, to deliver and concede to the said parties of the second part, their heirs, executors, administrators, or assigns, the exclusive use, control, possession, and management of the Los Angeles City Water Works, so called, together with, all and singular, the pipes, flumes, wheels, and other personal property composing and appertaining to said water works, in any manner whatsoever, with all the rights, easements, and privileges, and covenants as described and contained in a certain instrument of lease executed by the mayor and common council of the said city of Los Angeles, of date October 16, A. D. one thousand eight hundred and sixty-five, to Jean L. Sainsevaine, for the period of thirty years from the signing and approval of this contract and ordinance, with the right to sell and distribute water for domestic purposes, and to receive the rents and profits thereof for their own use and benefit, except as hereinbefore provided, hereby giving and granting the said parties of the second part, their heirs, executors, administrators, or assigns, the right to lay pipes in any and all the streets of said city, and to dig and to make all necessary excavations for that purpose, and the right of way through, upon, and over land or street belonging to the said city of Los Angeles, with the additional right to take water from the Los Angeles river at a point above or near the present dam, provided, always, that the said parties of the second part, their heirs, executors, administrators, or assigns, shall at no time take from said river for the use of said water works more than ten inches of water, without the previous consent of the mayor and common council of said city, and that they will, within sixty days from the date hereof, select the point from which the water will be taken from said river. The said party of the first part hereby covenant and agree with the said parties of the second part, their heirs, executors, administrators, or assigns, that, at the expiration of the period of thirty years from the execution of this instrument, they will pay to the said parties of the second part, their heirs, executors, administrators, or assigns, the value of the improvements made in, about, and upon the said water works in pursuance of this contract; the same to be ascertained by arbitration, in case the parties cannot agree upon the value thereof; the said party of the first part and the parties of the second part, their heirs, executors, administrators, or assigns, to choose one man each, and the two men thus chosen to select a third man, and the judgment of the three men thus selected shall be final in the premises. And the said party of the first part hereby covenant and agree to make no other lease, sale, contract, grant, or franchise to any person or persons, corporation or company, for the sale or delivery of water to the inhabitants of said city for domestic purposes, during the continuance of this contract, always without prejudice to any rights already granted. And the said parties of the second part, their heirs, executors, administrators, or assigns, hereby covenant and agree with the said party of the first part that they will pay the sums of money at the time and in the manner hereinbefore mentioned and set forth, and cancel the claims hereinbefore mentioned and set forth, upon the signing and approval of this contract and ordinance by the proper parties thereto; that they will make the improvements hereinbefore mentioned and set forth, in the following manner, to wit: That they will replace all the wooden pipes now belonging to said water works within one year from the signing and approving of this contract and ordinance, and that they will extend said iron pipes as fast as the citizens desiring to be supplied with water for domestic purposes will agree to take sufficient water to pay ten per cent. per annum interest upon the cost

of extending such pipes through the streets now unsupplied with water; that they will, within one year, from the date hereof, place a hydrant, to be used as a protection against fire, at one corner of one street at each of the cross streets where the pipes are now laid down, and will erect hydrants at other street corners, according to the terms of this contract, as fast as the pipes are extended through the streets of the said city; that they will erect, or cause to be erected, an ornamental fountain upon the public plaza, of such design as the mayor and common council shall direct, within one year from the date hereof; that they will furnish water for the public schools, city hospitals, and jails free of charge, when the same are near the pipe, the city furnishing the necessary conduits for that purpose; that they will make all the improvements herein mentioned and set forth, and keep the same in repair, at their own cost and expense, for the said period of thirty years, and return the said water works to the said party of the first part, at the expiration of the said period of thirty years, in good order and condition. reasonable wear and the damage of the elements excepted, upon the payment to them of the value of the improvements made after the approval of this contract, to be ascertained as hereinbefore provided, and give a bond in the sum of twenty thousand dollars, conditioned for the compliance by them of the conditions of this contract, to be approved by the mayor of said city, and will pay all state and county taxes assessed upon said water works during the said period of thirty years: always provided, that the mayor and common council of said city shall have, and do reserve, the right to regulate the water rates charged by said parties of the second part, or their assigns, provided that they shall not so reduce such water rates or so fix the price thereof to be less than those now charged by the parties of the second part for water: provided, that a certain contract of lease heretofore executed by the mayor and common council of said city to Jean L. Sainsevaine of said water works, of date October sixteenth, A. D. one thousand eight hundred and sixty-five, be surrendered up and canceled at or before the signing of this contract: provided, always, that the rights and privileges by these presents conceded to said parties of the second part do not embrace, to any extent, or have any reference to, the water works of said city used for the distribution of water for the purposes of irrigation, or affect in any manner any rights of irrigation either existing at present, or which may exist hereafter, except as to the ten inches of water, as hereinbefore provided. And it is expressly stipulated and covenanted that said parties of the second part shall not dispose of any water for the purpose of irrigation, but shall only take from said river the water necessary for domestic purposes, as above specified.   In testimony whereof, the said parties have hereunto set their hands and seals the day and year first above written.            John King, President.

"Approved this 22nd day of July, A. D. 1868.

"C. Aguilar, Mayor.

"John S. Griffin.    [Seal.]
"P. Beaudry.       [Seal.]
"S. Lazard.        [Seal.]"

The 30 years mentioned in this contract expired with the 22d day of July, 1898, for which reason the defendants contend that the contract then came to an end, and for which reason they also say that this court is without jurisdiction of this cause.  The objection to the jurisdiction of the court is clearly without merit.  Whether or not the contract ended with the 22d day of July, 1898, as well as the results to flow from the determination of that question, are questions involving the exercise of jurisdiction, and can only be determined after the court takes jurisdiction of the case.  The bill alleges that the contract, including all of its provisions and conditions, continues in force, and that notwithstanding that fact the defendant city, under and pursuant to the provisions of sections 1 and 2 of article 14 of the constitution of the state of California, adopted in the year 1879, and by virtue of an act of the legislature

of the state of California approved March 7, 1881, passed in pursuance of those provisions of the constitution of the state, enacted the ordinance in question, fixing the rates at which the complainant should furnish water to its consumers at rates aggregating $75,000 less than those prevailing at the time of the execution of the contract of July 22, 1868, in violation of its provisions, and contrary to that provision of the constitution of the United States securing it against impairment. That the question so presented is of federal cognizance does not admit of doubt, and it is equally plain that, if the contract is still in force, a court of equity only is capable of affording the complainant appropriate relief. Hamilton Gaslight & Coke Co. v. Hamilton City, 146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963; City of Shreveport v. Cole, 129 U. S. 36, 10 Sup. Ct. 210, 32 L. Ed. 589; Insurance Co. v. Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626; Douglas v. Kentucky, 168 U. S. 488, 18 Sup. Ct. 199, 42 L. Ed. 553; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; City of New Orleans v. Citizens' Bank of Louisiana, 167 U. S. 371, 17 Sup. Ct. 905, 42 L. Ed. 202; City of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; Benson v. City of San Diego (C. C.) 100 Fed. 158; Kimball v. City of Cedar Rapids, Id. 802; Agua Pura Co. v. City of Las Vegas (N. M.) 60 Pac. 208; Southwest Missouri Light Co. v. City of Joplin (C. C.) 101 Fed. 23; Bank v. Stone (C. C.) 88 Fed. 383; Mercantile Trust & Deposit Co. of Baltimore v. Collins, Park & B. R. Co. (C. C.) 99 Fed. 812; Citizens' St. Ry. Co. v. City Ry. Co. (C. C.) 56 Fed. 746; Iron Mountain R. Co. of Memphis v. City of Memphis, 35 C. C. A. 410, 96 Fed. 113.

The ordinance sought to be annulled provides, among other things, that:

"Any person who shall charge, demand, collect or receive, either as owner, agent, collector, employee of any water company or person furnishing water to the inhabitants of said city for domestic use or private purposes, any rate or compensation for water furnished to the inhabitants of the city of Los Angeles in excess of the rates fixed by this ordinance, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not to exceed one hundred dollars, or shall be imprisoned in the city jail for a term not exceeding ninety days, or shall be punishable by both such fine and imprisonment."

The bill sets out the provisions of the constitution and statute of California above referred to. The constitutional provisions are as follows:

"Section 1. The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law: provided, that the rates or compensation to be collected by any person, company or corporation in this state for the use of water supplied to any city or town, or the inhabitants thereof, shall be fixed annually by the board of supervisors, or city and county, or city, or town council, or other governing body of such city and county, or city, or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Any board or body failing to pass the necessary ordinances or reso-

lutions fixing water rates, where necessary, within such time, shall be subject to peremptory process to compel action, at the suit of any party interested, and shall be liable to such further processes and penalties as the legislature may prescribe. Any person, company, or corporation collecting water rates in any city and county, or city, or town, in this state, otherwise than as so established, shall forfeit the franchises and water-works of such person, company or corporation to the city and county, or city, or town, where the same are collected, for the public use.

"Sec. 2. The right to collect rates or compensation for the use of waters supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

The act of March 7, 1881, of the state of California, passed pursuant to these constitutional provisions, and referred to in the bill, provides as follows:

"Section 1. The board of supervisors, town council, board of aldermen, or other legislative body of any city and county, city, or town, are hereby authorized and empowered, and it is hereby made their official duty, to annually fix the rates that shall be charged and collected by any person, company, association or corporation for water furnished to any such city and county, city, or town, or the inhabitants thereof. Such rates shall be fixed at a regular or special session of such board or other legislative body held during the month of February of each year, and shall take effect on the first day of July thereafter, and shall continue in full force and effect for the term of one year and no longer."

"Sec. 6. The rates for the furnishing of water shall be equal and uniform. There shall be no discriminations made between persons, nor between persons and corporations, nor as to the use of water for private and domestic and public or municipal purposes: provided, that nothing herein shall be so construed as to allow any person, company, association or corporation to charge any person, corporation or association anything for water furnished them, when by any present law such water is free.

"Sec. 7. Any person, company, association or corporation charging or attempting to collect from the persons, corporations or municipalities using water any sum in excess of the rate fixed as hereinbefore designated, shall, upon the complaint of said board of supervisors, town council, board of aldermen or other legislative body thereof, or of any water rate payer, and upon conviction in any court of competent jurisdiction, forfeit the franchises and water-works of such person, company, association or corporation to the city and county, city, or town wherein the said water is furnished and used.

"Sec. 8. Any board of supervisors or other legislative body of any city and county, city, or town, which shall fail or refuse to perform any of the duties prescribed by this act at the time and in the manner hereinbefore specified, shall be deemed guilty of malfeasance in office, and upon conviction thereof at the suit of any interested party in any court of competent jurisdiction shall be removed from office."

The bill alleges that at no time prior to the adoption of the constitution of 1879 was there any law of the state of California imposing any condition of forfeiture of the works of any company or individual engaged in the business of supplying water to the inhabitants of cities and towns and to the municipalities, for charging rates other than those fixed by the governing body of such city or town, or any other agency established by law for fixing such rates, or any conditions of forfeiture of such works for or on account of the rates charged by such person, company, or corporation; that the provisions of the constitution and statute of the state of California mentioned, attempt to annex to the estate of the complainant in the system of water works mentioned in the bill a condition sub-

sequent to the contract of 1868, in impairment of its provisions, and in violation of the provisions of the constitution of the United States; that the defendant city claims that, under and by virtue of the above provisions of the constitution and statute of California, it has the right to fix rates to be charged by any individual, company, or corporation engaged in the business of furnishing water to the city of Los Angeles or its inhabitants for all purposes, and that the rates so fixed by it are the only rates that can be charged or collected by such company, individual, or corporation, including the complainant, and that the collection of any rate by the complainant in excess of the rates so fixed by the ordinance here in question subjects the property of the complainant to forfeiture to the city, and it threatens and intends, and will, unless restrained by this court, in the event the complainant should collect the minimum rates provided for in the contract of July 22, 1868, or any rates except those fixed by the ordinance of February 26, 1900, attempt to enforce the forfeiture of the property of the complainant, and threatens and intends and will attempt to seize the water works mentioned, and to dispossess the complainant thereof, and to take possession of, manage, and control the disposition of the waters through the system of works belonging to complainant, and to collect the rates therefor and claim the same as the property of the city, free and discharged of all claims of the complainant for the payment of the value thereof as provided in the contract of July 22, 1868; that the city further claims that the provisions of the ordinance in question making it a misdemeanor for any person, corporation, or company so engaged in the business of furnishing water to the inhabitants of the city to charge, demand, collect or receive, either as owner, agent, collector, or employé of any water company or person so furnishing water to the inhabitants, any rate or compensation in excess of the rates fixed by the ordinance, is a valid provision, and threatens complainant and its agents, collectors, and employés, in the event complainant should attempt to collect any rates other than those so established, with divers criminal prosecutions and a multiplicity of suits under the provisions of the ordinance, and will so harass and annoy and prosecute the complainant and its agents, collectors, and employés, unless restrained by this court.

The bill shows that the rights and obligations of Griffin, Beaudry, and Lazard under the contract were transferred to the complainant water company on the 12th day of June, 1869, and that on the 2d day of April, 1870, the contract and ordinance authorizing the same were ratified by the legislature of the state. It further shows that the complainant and its assignors paid to the city the $1,500 per annum provided for in the contract until the 2d day of December, 1870, on which day the city and the complainant company, for mutual considerations, reduced the annual payment from $1,500 to $400, after which the annual payment of $400 was regularly made by the complainant under the contract of July 22, 1868, and received by the city. The bill also shows that the Sainsevaine lease was surrendered and canceled as provided for by the contract of July 22, 1868, prior to its execution, and that the claims of Griffin, Beaudry,

and Lazard against the city, therein referred to, amounting to the sum of $8,000, were also surrendered and canceled. It further shows that, differences having arisen between the respective parties concerning the rates that were charged at the time of the execution of the contract for furnishing water to the inhabitants of the city by the parties of the second part thereto, commissioners were, in the year 1870, appointed by the city for the purpose of ascertaining and determining what those rates were, which committee, after investigation, reported to the council certain rates, in the bill set out, as being those charged at the date of the contract of July 22, 1868, and which rates so ascertained and reported were accepted by the city and the complainant water company as being the rates charged at the date of the contract by the parties of the second part thereto. The bill further alleges that, in pursuance of the terms and provisions of the contract, Griffin, Beaudry, and Lazard, and their successor in interest, the present complainant, replaced within one year from the execution of the contract all of the wooden pipes then pertaining to the water works with iron pipes, and that the complainant company, after succeeding to the rights of Griffin, Beaudry, and Lazard under the contract, proceeded to lay down 12 miles of iron pipes within the time therein prescribed, and has continued the extension of such pipe lines, and constructed a system of pipes and reservoirs under and in pursuance of the contract for supplying the city with water for municipal purposes, and its inhabitants with water for domestic uses, and in the construction of the system originally provided for, and in its extension, has laid down about 320 miles of iron pipes in the city, and has been conducting the water and distributing the same to the city and its inhabitants for more than 30 years, and has, under the direction and supervision of the city, by and through its constituted authorities, and under and in pursuance of the contract, erected more than 600 fire hydrants, and has during all the time mentioned been supplying the city with water for extinguishing fires, and for the use of the public schools, jails, hospitals, and all other public municipal buildings, free of charge, and furnishing the inhabitants of the city with water for domestic purposes and collecting rates therefor; that within one year from the approval of the contract of 1868 the complainant and its predecessors in interest erected an ornamental fountain upon the public plaza of the city, of a design directed by its mayor and common council, and did at their own expense, and within the time provided in the contract, construct such ditches and flumes and erect such machinery in connection with the waterworks as to secure to the inhabitants of the city a constant supply of water for domestic purposes, and did construct reservoirs of sufficient capacity for these purposes, and has erected one hydrant, to be used as a protection against fire, at each cross street in the city where water pipes were then laid, and also where water pipes were thereafter laid, and, as requested and directed by the council of the city, did give the bond provided for in the contract. It is alleged that the complainant has extended the iron-pipe system as fast as the citizens of the city desiring to be supplied with water for domestic

purposes would agree to take sufficient water to pay 10 per cent. per annum interest upon the cost of extending such pipes through the streets then unsupplied with water; that the complainant has constructed for use in connection with the said system of water works four reservoirs, having an aggregate capacity of 20,000,000 gallons, all of which are used in connection with and as a part of the system; that at the date of the contract in question the territorial limits of the city were about four square leagues, in a square form, the center of which was the center of what was known as the "Old Pueblo Plaza," and was co-extensive with the limits of the four square leagues which had theretofore been patented by the United States government in pursuance of the decree of confirmation of the city's claim under the grant made to it by the Mexican government, and that in the year 1872 the limits of the city were extended 420 yards south of its former south boundary, and so as to embrace a tract of land 420 yards in width, and extending across the southern boundary of the city, and that within the last two years the limits of the city have been further extended so as to include about 15 or 16 square miles of additional territory; that the complainant has, in pursuance of the request and direction of the city, and in pursuance of the contract in question, extended its water system into the said tracts of land which have been added to the city limits as above stated, and has, at the request and under the direction of the city, from time to time, and extending down to a period within six months of the commencement of this suit, erected fire hydrants within the limits of the said new territory thus included within the city, and outside of the boundaries of the city as existing in 1868 and in 1872, and that school houses have been erected in said added limits, and the complainant has been furnishing water for the extinguishment of fires in the said added limits, and has also furnished water for the school houses constructed within such additional limits, free of charge, and that said extensions of the pipe lines and the erection of the fire hydrants were demanded by the city, and made by the complainant, for the use of such school houses and for the extinguishment of fires, free of charge, under and in pursuance of the contract of July 22, 1868, and not otherwise. The bill shows that in the construction of this water system the complainant has expended more than $2,500,000; that since the execution of the contract of 1868 the city has increased in population until there are now more than 100,000 inhabitants within its limits; that at the time of the execution of the contract there were but three school houses in the city, with an average aggregate number of pupils of about 250, and that there are now more than 60 school houses within the city limits, with an attendance in the public schools of about 25,000 pupils; that within the territory added to the city since the execution of the contract about 20,000 people reside, and use water from the complainant's system for domestic purposes.

The bill further alleges that, within 60 days of the date of the contract in question, Griffin, Beaudry, and Lazard selected the point from which the water should be taken from the Los Angeles river,

which point was above the dam mentioned therein, and that the point thus selected was so located that it was difficult to maintain a dam in the stream, owing to the frequent changes wrought by floods therein, and that in order to obviate those difficulties, and to obtain the water at a higher elevation, and to enable the complainant more effectually to perform the terms of the contract, a new location was made by the complainant, by and with the consent of the city, at a point still higher up the river, and about six miles above the north boundary of the city, from which point the complainant constructed a ditch, by means of which and of flumes the complainant conducted the waters of the river to the city, and discharged the same into a reservoir known as the "Buena Vista Street Reservoir," near the northern boundary of the city and within its limits, and from thence conveyed the waters by means of iron pipes through the city, and distributed them for the purposes of supplying the inhabitants of the city with water for domestic uses, and the city with water for all public uses, including the extinguishment of fires, which ditch has since been known as the "Power Ditch," and is still used by the complainant in diverting the waters of the river and conducting the same to the said reservoir for the uses and purposes stated; that owing to the growth of the city, and the increase in its population and in buildings of all kinds, it became necessary to obtain larger supplies of water, for the purpose of enabling the complainant to furnish the inhabitants of the city, and the city itself, with an adequate supply of water for the purposes mentioned in the contract in question; that about the year 1886 a corporation was organized, known as the Crystal Springs Land & Water Company, which company acquired various tracts of land and rights of development in the Ranchos Los Feliz and San Rafael, lying to the north of the city, and that the Crystal Springs Land & Water Company did, at heavy expense, make excavations and lay pipes within those portions of the Los Feliz and San Rafael Ranchos, and developed of the waters percolating in said soil about 650 inches of water, measured under a 4-inch pressure, and that the said Crystal Springs Land & Water Company did lay and construct a pipe line extending from a point known as the "Gate House," and into which the said developed waters were collected, down to the north boundary of the city, and did, by means of the said conduit, conduct the said waters to the north boundary of the city, and that the complainant leased from said Crystal Springs Land & Water Company its waters and pipe line, and conducted the same to the Buena Vista street reservoir, and has ever since used the same for the purpose of distributing the water to the inhabitants of the city through the system of works already mentioned; that the excavations made and the pipe line laid by the Crystal Springs Land & Water Company were completed in the year 1890; that in the year 1894 that company constructed another pipe line, known as the "Bellevue Branch," which connected with the main conduit used for conducting the waters from the Gate House to the north boundary of the city at a point between the Gate House and the north boundary, and about a mile and a half

103 F.—46

north of the north boundary of the city, and extended the branch line in a southwesterly direction to the reservoir known as the "Bellevue Reservoir," belonging to the Crystal Springs Land & Water Company, of a capacity of about 40,000,000 gallons, and that the Crystal Springs Land & Water Company constructed pipes leading from that reservoir to a point on the western side of Hoover street, then outside of the city of Los Angeles, and from the said western side of Hoover street continued that pipe line in a southerly direction to Seventh street, and there, under the lease and contract aforesaid, delivers the water to complainant, and from thence it is conducted by complainant in its said system of pipes, and distributed throughout the city, for the purposes mentioned in the contract of July 22, 1868; that the main conduit of the Crystal Springs Land & Water Company is an iron pipe about 44 inches in diameter, and the Bellevue Branch pipe is of about the same dimensions, and that the pipe extending from the western side of Hoover street to Seventh street is 30 inches in diameter, which last-mentioned pipe was, when it was laid, outside of the territorial limits of the city, and is in a portion of the territory which has since been incorporated within the city; that ever since the said pipe has been laid it has been used continuously for the purpose of conducting water to the complainant's system of pipes, and for distribution by the complainant among the inhabitants of the city for domestic purposes, and for furnishing the city with water for municipal uses; that in the year 1893 the complainant purchased the system of water works known as the "Citizens' Water Company's Water Works," which had been constructed, for supplying the hilly portion of the city, upon lands lying above the pipes of the complainant; and that immediately after that purchase the system was remodeled, enlarged, and re-enforced by complainant, and connected with its system of water works, and has ever since been owned by the complainant; that thereafter the complainant acquired the stock of the East Side Spring Water Company, which company was organized for the purpose of supplying portions of the eastern side of the city of Los Angeles with water, and obtained control of that property consisting of the system of water works constructed by the East Side Spring Water Company, and connected the same with the system belonging to complainant more than five years ago, and that the said Citizens' Water Company's plant, as remodeled and improved by complainant, and the said East Side Spring Water Company's plant, also improved and repaired by complainant, are now connected together, and constitute a part of the system of water works of complainant, and used by it for the purpose of supplying the city and its inhabitants with water as in the contract of 1868 provided. The bill alleges that it was necessary for the complainant to acquire the plants of the said East Side Spring Water Company and the said Citizens' Water Company, and the waters thereof, as also the waters developed by the Crystal Springs Land & Water Company, and also waters from the Arroyo Seco, to the extent of about 75 inches, measured under a 4-inch pressure, in order to enable it to furnish an adequate supply of water to the city and its inhabitants; that in

order to furnish an adequate supply to the inhabitants of the city, and to the city itself, for municipal uses, it requires, and has required ever since the execution of the contract of 1868, from 70 to 130 gallons of water per capita per day, and that never at any time would 10 inches of water, measured under a 4-inch pressure, have been sufficient to supply the inhabitants of the city with water for the uses and purposes mentioned in the contract in question; that, when the ditch was first constructed by complainant for the purpose of conducting the waters of the Los Angeles river to the city for the purposes mentioned, complainant, with the knowledge and consent and acquiescence of the city, took at least 200 inches of water, measured under a 4-inch pressure; that of the waters so diverted a large proportion was lost by seepage and evaporation along the line of the ditch, which was from the beginning about five or six miles in length; that at that time more than 30 inches of water were used in the city for supplying the city and its inhabitants with water for the uses and purposes mentioned in the contract, and that more than 30 inches, measured under 4-inch pressure, were required for those purposes during all of the time, and that as the city increased in population and in buildings of various kinds, and as industries sprang up, requiring the use of water for machinery and manufacturing purposes, all of which have been supplied by the complainant, with the knowledge and consent of the city, ever since the contract was executed, it became necessary to increase the amount from time to time, until more than 20 years ago the amount so taken from the Los Angeles river by and through the said Power ditch by complainant for the purposes stated amounted to at least four or five hundred inches, measured under 4-inch pressure, and such quantity has been increased to meet the growing demands of the city until the whole amount now used by the complainant, including the waters acquired by it from the Arroyo Seco and from the Crystal Springs Land & Water Company developments, amounts to an average daily use of about 1,200 inches, measured under a 4-inch pressure, and in the summer season expands sometimes to as much as 1,600 inches, measured under a like pressure, and that during all of the said time, and as the amount was increased as aforesaid, and up to the year 1896, no objection of any kind was ever made by the city, although the same was done with its knowledge, but that, on the contrary, the city acquiesced in the taking of the said water, and understood that complainant had the right to take the same, and whatever quantity was necessary for the purpose of supplying the city and its inhabitants with water, provided, always, that the amount so taken did not interfere with the use of the waters of the river for irrigation purposes, as provided in the contract of July 22, 1868; that never at any time has the complainant's diversion of the waters of the river diminished the same so that the city has not had an ample supply of water for irrigation purposes, but that, on the contrary, the city has, during all of the 20 years last past, been disposing of waters of the river for irrigation to a greater or less extent each year for use outside of the city limits.

The bill further alleges that the city has been continually increasing in population, and in the number of residences and other buildings of all kinds; that ever since the execution of the contract in question the complainant has been furnishing the inhabitants of the city with water for all purposes other than irrigation, including the water for the generation of steam for the operation of steam engines of various kinds employed in the manufacturing businesses of the city, for operating elevators in buildings, for use in livery stables and private residences, for watering horses, washing carriages, and other like uses, and that such use has been made during the entire period with the knowledge and acquiescence of the city, and that the term "domestic uses," as used in the contract in question, has been interpreted by the parties from the beginning to mean, and that the said term was intended to grant to the complainant and its predecessors, the right, and to impose upon them the duty, of furnishing the water to supply the inhabitants of the city for all uses and for all purposes except irrigation; that the number of houses in the city is now, and for more than two years last past has been, increasing at the rate of more than 100 per month, and that each and all of them demand and require surface connections to be made with the complainant's system of water works, for the purpose of supplying the same with water, and that complainant has continued ever since the 22d day of July, 1898,—the expiration of the 30-year period mentioned in the contract in question, —to make such surface connections, and to supply such new edifices and industrial establishments with water for their uses, and that the city has required and directed the complainant, since the last-mentioned date, at divers times, to make extensions of its pipes, and to erect other fire hydrants, all of which have been complied with by the complainant in pursuance of the terms of the contract; that notwithstanding the meaning of the provisions of the constitution of California above set out is that the governing body of every city or town in the state should in the month of February fix and establish a rate to be charged by any company or individual engaged in the business of supplying water to the city and its inhabitants for all purposes, the council of the defendant city has during every year since July 22, 1898, passed an ordinance fixing the rates to be charged by such companies and individuals, but has never in any instance fixed any rate to be charged by the complainant for furnishing water to the city for use in the public schools, jails, or other public buildings, or for extinguishing fires, but, on the contrary, has at all times claimed that the complainant is bound to furnish the city with water for public uses as provided in the contract of July 22, 1868, free of charge, and that the complainant has acceded to that claim, and has admitted and does now admit that it is bound by the terms of that contract to furnish the defendant city with water for its municipal purposes in accordance with the terms of the contract, and that the contract continues in full force, and will so continue until the complainant is paid the value of the said water works. The bill further alleges that the defendant city pretends that by reason of the fact that the complainant is diverting from the Los Angeles river from 600 inches, measured under 4-inch pressure, to 1,000 inches, measured under a like pressure, in

order to supply the needs of the city and its inhabitants with water, the complainant is taking an amount of water in excess of the amount mentioned in the contract of July 22, 1868, claiming that, by the 10 inches of water mentioned in that contract, 10 inches measured under a 4-inch pressure was intended, and that because the complainant is so diverting a larger amount than 10 inches measured under a 4-inch pressure, it is not acting under and in pursuance of the contract, and that therefore the city has the right to fix the rates, under the provisions of the constitution and act of the legislature of the state of California, without regard to the contract rate; that the said claims on the part of the city are unfounded; that it was not the intention of the contract to limit complainant or its predecessors in interest to the taking of 10 inches of water, measured under a 4-inch pressure, nor to prevent them from taking any other amount of water necessary to the performance of the contract to supply the city and its inhabitants with water, provided that such amount so taken and diverted did not deprive the city of sufficient water for irrigation purposes; that at the time of the making of the contract in question there was no known source of supply of water for the city, other than the Los Angeles river, and that the obtaining of water by the complainant from any other source was not contemplated or deemed possible at that time; that at the time the contract was made there was no knowledge on the part of any of the parties to the contract, or any one else, of the existence of underground percolating waters in the vicinity of the city, and from which a supply could be obtained, and that the amount of such underground percolating waters yet developed is not now sufficient to supply one-half of the quantity necessary for supplying the city and its inhabitants with water; that as the city has grown and expanded, and as the higher elevations of the city have become settled and inhabited, the convenience and comfort and health of the inhabitants have required the grading of a large number of streets, until the amount of such graded streets at present existing in the city is more than 300 miles, and that, to keep those streets in good order and condition, it is necessary that they should be regularly sprinkled; that the sprinkling of streets was not one of the purposes for which the complainant could use the waters of the river, but, on the contrary, that the sprinkling of streets is included under the term "irrigation"; that, owing to the position of many of the graded streets, it became necessary that water should be provided for street-sprinkling purposes at higher elevations than any of the ditches belonging to the city, and that for the convenience of obtaining such water, and filling the sprinkling carts used in that business, it became necessary that the city should obtain the water for this purpose through the works of the complainant, and that the city has constantly for more than 15 years obtained the water for street sprinkling through the system of water works of the complainant, and that the complainant has furnished water through its works for such purposes free of charge, and that the city now obtains from the complainant, through its system of works, water for street sprinkling to the amount of 3,000,000 gallons per day; that the water is so furnished through the complainant's said system of water works, and is received by the city

from the fire hydrants erected by the complainant, and kept and maintained at complainant's expense, as provided in the contract in question, and that the city has not paid at any time, and does not now pay, to the complainant, any compensation whatever for the water so furnished through the said system for street sprinkling, and that the city claims, and has at all times claimed, that the street sprinkling comes within the provisions of the contract in question providing for the city's use of the water for irrigation purposes, and that the term "irrigation purposes," as used in that contract, includes the sprinkling of streets, and that the city has never, in any ordinance passed by it regulating or assuming to regulate and fix the price to be charged for water, fixed or established any rate to be paid for street sprinkling; that the city has already laid and constructed more than 100 miles of sewer pipes within the city limits, and has caused to be connected therewith more than 600 flush tanks, the water supply of which is furnished through the pipes of the complainant for the purpose of flushing the sewers, and that the city continues to increase the number of taps upon the complainant's system of water works connecting the same with flush tanks constructed from time to time by the city as its needs require, and which are used in flushing the said sewers, and demands and obtains from the complainant and its said system of water works the water used in flushing the sewers, all of which is furnished by the complainant free of charge, and that the city has never paid or tendered or offered to pay any amount whatever therefor, nor made any provision in its ordinances for rates fixing the payment therefor; that the construction of the sewers and flush tanks and surface taps connected therewith has been carried on by the city from time to time as the sewer system was constructed and increased, and extending over a period of 15 years last past, and that the city has taken the water for flushing the sewers from the system of the complainant, and that a large portion of the water so diverted by the complainant from the Los Angeles river is and has been furnished to the city by the complainant and used by the city for those purposes; that the city also claims that the contract of July 22, 1868, has expired, and that it is no longer bound by its terms; that the city has not paid to the complainant the value of the water works as in the contract provided, nor otherwise, nor at all, nor paid or tendered to the complainant any portion of the value of the property, or any sum of money thereon, whatever, nor has the value of the property or the price to be paid therefor ever been fixed or determined, either by the agreement of the parties or otherwise, and that under the terms of the contract the complainant is entitled to the possession and operation of the water works until such payment, and that the contract does not expire until the payment is made; that the city and its inhabitants insist upon the performance by the complainant of all the terms of the contract imposed upon the complainant, and which are burdensome, and that such demands have been acceded to by the complainant, and it has continued to perform, and does now perform, all the terms of the contract upon its part to be performed, but that the city denies that the contract continues in force for any of the purposes beneficial to the complainant; that the complainant has been constantly doing

all things which the contract requires it to perform in providing water to the municipality for public use, and to its inhabitants for all uses other than irrigation, all of which is and has been well known to the city, and that the city is receiving all of the benefits of the contract that accrue to it under the terms of the contract in question, and that the complainant cannot cease to make such extensions and provisions of all kinds for supplying the increased population of the city without stopping its growth and progress.   The bill further alleges that, under the terms and provisions of the contract in question, arbitrators were appointed, one by the complainant and one by the city, and the third by the two thus selected, and that proceedings were had and evidence taken before them for the purpose of determining the value of the complainant's system of water works, and that a pretended award was made by two only of the arbitrators, whereby they agreed upon and reported to the council of the defendant city as the value of the said property the sum of $1,183,591.42, and that the city claims that the said report, concurred in by the two arbitrators, constitutes an award and a final determination of the value of the property, all of which is denied by the complainant, which claims that, if the award be not void upon its face, it was obtained by such means as that it should be set aside, and that a suit has been brought by the complainant in this court for the purpose of having the said award decreed to be invalid and to be set aside, and that the court fix the value of the property in question; that the amount so named as the value of the property by the two arbitrators was not concurred in by the third, but, on the contrary, that the third arbitrator dissented from the award, and declared as his opinion that the amount awarded by the two was far less than the actual value of the property; that the rates fixed by the ordinance of February 26, 1900, here in question, would not produce sufficient revenue over and above the cost of main- tenance and operating the said water works to pay 7 per cent. per annum upon the amount of the pretended award, and would not pro- duce sufficient revenue, over and above the cost of maintenance and operation of the works to pay $3\frac{1}{2}$ per cent. on the actual value of the property.

By the supplemental bill the complainant alleges, among other things, that since the filing of the original bill, and on the 25th day of June, 1900, the council of the defendant city adopted an ordi- nance entitled "An ordinance regulating the rates and compensa- tion allowed to be collected by the West Side Water Company, a cor- poration, supplying water for domestic and private purposes to the inhabitants of the city of Los Angeles, during the year commencing July 1, 1900, and ending June 30, 1901," which ordinance the sup- plemental bill sets out at large, and alleges that, if it be intended to apply to the West Side Water Company alone, it is unjust and not uniform, in that it fixes rates largely in excess of the rates fixed by the ordinance of February 26, 1900, set forth in the original bill, and thereby authorizes or attempts to authorize the West Side Wa- ter Company to charge and receive a much larger compensation for furnishing water to the inhabitants of the city for domestic uses and the various uses and purposes therein named than it has fixed by

the ordinance of February 26, 1900; that while the ordinance of June 25, 1900, does not fix any rate to be charged for the use of water for extinguishing fires, yet there is a contract between the defendant city and the said West Side Water Company whereby the city pays the West Side Water Company a rental of $40 per annum for each and every fire hydrant under its system, for water furnished to the city for extinguishing fires. The supplemental bill further alleges that on the 29th day of June, 1900, the council of the defendant city passed another ordinance assuming to fix the rates to be charged by the Highland Water Company, a corporation engaged in supplying a part of the inhabitants of another portion of the city that had been recently included within the city limits, and that the rates so pretended to be established by the last-mentioned ordinance are the same as the rates fixed by an ordinance adopted in February, 1899, which were substantially the same as the rates fixed in the aforesaid ordinance of June 25, 1900; that each and all of the aforesaid ordinances passed in the year 1900, and the ordinance of February, 1899, fix the rates to be charged for the use of water at much less than was charged by the complainant's predecessors in interest at the time of the execution of the contract of July 22, 1868, each and all of which impair the obligations of that contract, in violation of the constitution of the United States; that by reason of the enactment of the several ordinances of the year 1900 it is rendered uncertain and doubtful as to which fixes the rate to be collected from and after the 1st day of July, 1900, by any corporation, company, or individual to which the same are applicable, and that the complainant does not know to which of the said ordinances to conform, in order to avoid taking any risk of forfeiture of its water works to the city, and alleges that, though neither of them is valid as to the complainant, such forfeiture will be attempted to be enforced unless it conforms to such of the ordinances as the defendants may assert regulates the rates to be charged by the complainant, unless restrained by this court. The supplemental bill also shows that both of the last-mentioned ordinances, to wit, those enacted June 25 and 29, 1900, also contain the provision that "any person who shall charge, demand, collect or receive, either as owner, agent, collector, employé of any water company or person furnishing water to the inhabitants of said city for domestic use or private purposes, any rate or compensation for water furnished to the inhabitants of the city of Los Angeles in excess of the rates fixed by this ordinance, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not to exceed one hundred dollars, or shall be imprisoned in the city jail for a term not exceeding ninety days, or shall be punishable by both such fine and imprisonment," and alleges that the individual rate payers who are made defendants to the supplemental bill have asserted that they are not bound to pay any greater rate to the complainant for the water furnished to them than the rates fixed by the ordinance of February 26, 1900, set out in the original bill, and threaten and intend to tender to the complainant the rates so fixed for the several services and uses for which the water is

furnished them, and that each of them intends to refuse to pay any greater sum for such water, and threatens and intends, unless the complainant accepts such compensation and continues to furnish them with water for domestic uses at those rates, that they will institute divers legal proceedings against the complainant to hinder and prevent it from collecting the rates to which it is entitled under the contract of July 22, 1868, and in the event the complainant charges more than the rates fixed by the ordinance of February 26, 1900, will institute proceedings to obtain a decree of forfeiture of the complainant's property to the city, unless restrained by this court. The supplemental bill also repeats in substance some of the averments of the original bill in respect to the supplying by the complainant of the city and its inhabitants with water through the water works described in the original bill under the contract of July 22, 1868, and the acceptance of such service by the city and its inhabitants. The relief sought by the complainant is a decree that the ordinance of February 26, 1900, is, as respects the complainant, a violation of its rights under the contract of July 22, 1868, and therefore void, and that the complainant is entitled to collect water rates as in that contract provided, and that pending this suit the defendants be enjoined from enforcing or attempting to enforce, as respects the complainant, either of the ordinances of 1900, and that the defendant city, its officers, agents, and employés, be restrained from taking possession or attempting to take possession of the system of water works referred to, or ousting the complainant of the possession thereof, or from collecting or attempting to collect any rates for water furnished thereby, or from in any manner interfering with the management, operation, or control thereof by the complainant, and that the defendants be enjoined from enforcing or attempting to enforce any claim of forfeiture of the said water works growing out of any rates collected or charged by the complainant under and pursuant to the contract of July 22, 1868, and for such other and further relief as may be equitable and just.

It is apparent that the suit involves no question between the city and the Crystal Springs Land & Water Company in respect to the water, whatever its nature, alleged in the bill to have been developed by that company on its own land, and leased to the complainant company. The exceptions to that portion of the bill, therefore, setting out the nature of the water alleged to have been developed by the Crystal Springs Land & Water Company on its land, as well as its source of title thereto, will be sustained, as also the exceptions to that portion of the bill alleging the percentage upon the actual value of the property in question, as well as the percentage upon the award referred to in the bill that can be realized by the complainant under the rates established by the ordinance in question. The averments of the bills in regard to the conduct of the respective parties under the contract are not impertinent. The construction placed upon a contract by the parties to it by their conduct is always allowed to be shown, and is often of controlling weight in ascertaining their true meaning. Under this familiar rule, and for reasons afterwards stated, I am of opinion that none

of the other exceptions filed by the defendants are well taken. That a city in making such a contract as that here involved is acting in a quasi private business capacity, rather than in its governmental capacity, and is therefore governed by the same rules that govern a private individual or private corporation, is well settled. Illinois Trust & Savings Bank v. City of Arkansas City, 22 C. C. A. 171, 76 Fed. 271, and numerous cases there cited.

The fundamental question in the case relates to the status of the respective parties to the contract of July 22, 1868, upon the expiration of the 30 years therein mentioned, and since. That question, together with the incidental rights growing out of that status, is the only question here for determination. Upon the expiration of that period, litigation arose between these parties in the superior court of Los Angeles county, and was carried to the supreme court of the state. It was there said that the main question in those cases was this: "Had the city the right to take possession of the water works at the end of the 30 years, without paying for the same or tendering payment?" And the court, without a dissent, held that it had not. City of Los Angeles v. Los Angeles City Water Co., 124 Cal. 368, 379, 57 Pac. 210, 571. Why? Manifestly because the contract itself required such payment before its provisions were ended. In those cases it was contended on the part of the city, as it is contended here, that the instrument in question should be classed as a "lease," one of the features of which is that at the expiration of the term the lessor has an immediate right of re-entry and possession; but the court held that contention untenable, saying: "The written instrument in question cannot be categoried into any smaller class than that of a 'contract.' It is a contract with many and various covenants." This is entirely true, and any one who attempts to designate it by a particular name, such as a "lease" or "mortgage," and to rigidly apply the ordinary features of such instruments to its provisions, will wholly fail to give it its true interpretation. A bare perusal of the instrument plainly shows that it is a contract with many different covenants on the part of both parties to it. It would not have been a difficult matter to have made its language clearer and more concise. In several instances inapt words and expressions are used. For example, it provides for the "return" of the water works to the city upon the expiration of the 30 years, and the making of the payment for the improvements, which word—"return"—has been much commented on by counsel for the city as showing that the instrument should be treated as a lease. But, as was well said by counsel for the complainant, the city, so far as appears, has never been in possession of any part of the present works. No one can be properly said to "return" a thing never in his possession. The contract itself required the absolute demolition of what little there was of the old works, and the construction of an entirely new plant by the complainant and its predecessors. In Speed v. Railroad Co., 30 C. C. A. 1, 86 Fed. 237, it was said:

"It may be regarded as the recognized rule that in the exposition of grants and contracts the construction should be upon the view of the attitude of the

persons making it, and upon a comparison of every part of the entire instrument, so that, while endeavoring to give every substantive part operative effect, also to give it a practical, rather than a theoretical, application. And when the intention is apparent, without repugnance to the settled rules of law, it will control the technical terms; for the intention, and not the words, is the sense of any agreement, and this will prevail, regardless of inapt expressions or careless recitations."

See, also, Southwest Missouri Light Co. v. City of Joplin (C. C.) 101 Fed. 23. It is not at all difficult, in my judgment, to ascertain from the terms of the instrument itself the rights and obligations of the respective parties, not only during the 30-year period, but upon the expiration of that period; and when read in connection with the conduct of the parties thereunder, as disclosed by the pleadings, both during and since the expiration of the 30 years, it seems to me that no room for doubt remains. Taking the contract by its four corners, as all contracts should be taken, and reading the entire instrument, we see that the obligations thereby assumed by the predecessors of the complainant company were: To pay to the city an annual sum of $1,500, gold coin, on the 1st day of each January during the continuance of the contract (afterwards reduced by agreement of the respective parties to $400 per annum). The surrender by the complainant's predecessors of all claims then held by them against the city for repairs of the then water works and for damages, amounting to the sum of about $8,000. The making of certain improvements at their own expense in, about, and upon the then water works, thus specified: The laying down in the streets of the city of 12 miles of iron pipe of sufficient capacity to supply the inhabitants of the city with water for domestic purposes; the erection of one hydrant, to be used as a protection against fire, at one corner of each cross street of the city where the water pipes then were or might thereafter be laid by virtue of the contract; the erection within one year from the approval of the contract of an ornamental fountain upon the public plaza of the city, of such design as the mayor and common council of the city should direct, at a cost not to exceed $1,000; the construction within two years after the approval of the contract, at their own expense, of such ditches and flumes, and the erection of such machinery, in connection with the water works, as would secure to the inhabitants of the city a constant supply of water for domestic purposes; the construction of reservoirs of sufficient capacity for that purpose; the selection within 60 days from the date of the contract of the point from which the water should be taken from the river, such point to be at or above the then dam. To furnish water for the public schools, city hospitals, and jails free of charge, "when the same are near the pipe," the city furnishing the necessary conduits for that purpose. To give a bond in the sum of $20,000, conditioned for the compliance by them with the conditions of the contract. To pay all state and county taxes assessed upon the water works during the said period of 30 years. To return the works at the end of that period in good order and condition, reasonable wear and damage by the elements excepted, upon the payment to them of the value of the improvements made after the approval of the contract. To surren-

der up to the city the Sainsevaine lease, to be canceled, prior to the execution of the contract. In, so making the improvements specified, all of the wooden pipes were required to be replaced by the parties of the second part to the contract within one year from its execution; and they also obligated themselves, their heirs, executors, and assigns, to extend the iron pipes as fast as the citizens desiring to be supplied with water for domestic purposes would agree to take sufficient water to pay 10 per cent. per annum interest upon the cost of extending such pipes through the streets unsupplied with water, and that within one year from the date of the contract they were to place the hydrants to be used as a protection against fire at one corner of the cross streets where pipes were then laid, and erect others at the street corners, according to the terms of the contract, as fast as the pipes were extended through the streets of the city, and were to keep all of the water works in repair at their own expense during the said period of 30 years. The city, in consideration of the performance of these obligations on the part of the parties of the second part to the contract, granted to them, their heirs, executors, and assigns, the exclusive use, control, possession, and management of the then Los Angeles City Water Works, together with all and singular the pipes, flumes, wheels, and other personal property composing and appertaining thereto, with all the rights, easements, privileges, and covenants described and contained in the Sainsevaine lease, for the period of 30 years from the approval of the contract, with the right to sell and distribute water for domestic purposes, and to receive the rents and profits thereof for their own use and benefit, except as afterwards provided, and with the right to lay pipes in any and all of the streets of the city, and to dig and to make all necessary excavations for that purpose, and the right of way through and over land or streets belonging to the city, with the additional right to take water from the Los Angeles river at a point above or near the then-dam: "provided, always, that the said parties of the second part [Griffin, Beaudry, and Lazard], their heirs, executors, administrators, or assigns, shall at no time take from said river for the use of said water works more than 10 inches of water without the previous consent of the mayor and common council of said city." The city also covenanted not to make any other lease, sale, contract, grant, or franchise to any person or persons, corporation or company, for the sale or delivery of water to the inhabitants of the city for domestic purposes, during the continuance of the contract, always without prejudice to any rights already granted. Upon the foregoing rights and obligations were imposed by the contract these limitations: A provision declaring that the domestic uses therein specified and provided for were not to include the furnishing of water for irrigation, and that the parties of the second part should not have the right to dispose of any of the water of the river for that purpose. A reservation upon the part of the city of the right to regulate the rates to be charged by the parties of the second part, their heirs, executors, and assigns: "provided, that they shall not so reduce such water rates or so fix the price thereof to be less than those

now charged by the parties of the second part for water." The contract contained the further covenant and agreement on the part of the city to pay to the parties of the second part, their heirs, executors, administrators, or assigns, at the expiration of the period of 30 years from the execution of the instrument, the value of the improvements made in, about, and upon the water works in pursuance of the contract; the amount thereof to be ascertained, in the event the parties could not agree, by arbitration; each party to choose one man, and the two thus chosen to select a third, to determine the value; and the judgment of the three men so selected to be final in the premises.

The contention on the part of the city that the grant of the right to take water from the Los Angeles river was limited to 10 inches, measured under 4-inch pressure, was disposed of by the supreme court of California, by Judge Wellborn, and by the supreme court of the United States, adversely to the contention, in the cases already referred to; the supreme court of the state saying:

"The words of the contract on this subject are simply that the company shall not take from the river 'more than ten inches of water without the previous consent' of the city. There is nothing in the contract about 'four-inch pressure,' nor is there any intimation as to what the parties meant by 'ten inches' of water. But, looking at the context and the subject-matter of the contract, it is quite evident that the parties did not mean only ten inches under a four-inch pressure. If that had been the meaning, there would have been no sense in the other important covenants. At the time of the contract it would have taken many times ten inches under a four-inch pressure to furnish water for domestic purposes to even the few thousand people who were then inhabitants of the city, and much more than that amount was necessary to supply free water under the contract; and a solemn covenant to supply a growing city with sufficient water for domestic and municipal purposes for thirty years, from a flow of ten inches under a four-inch pressure, would have been absurd. The company, immediately after the date of the contract, commenced to use an amount of water greatly in excess of ten inches under a four-inch pressure. Soon after the execution of the contract the company was using three hundred inches under a four-inch pressure, and from that to the present time they have been using, with the knowledge and consent of the city, from three hundred to seven hundred inches, so measured. Therefore, whatever, if anything, was meant by the simple words 'ten inches,' the contract was immediately, and has been continuously, construed by the action of the parties as meaning more than ten inches measured under a four-inch pressure. There is no pretense that the city ever objected to the use of this water by the water company until 1896, when an ordinance was passed by the city government undertaking to withdraw the city's consent to the taking of more than ten inches from the river. It is difficult to imagine how this ordinance was passed seriously; for, if the water company had been prevented from taking from the river at that time more than ten inches of water under a four-inch pressure, there certainly would have been a water famine in the city, for the city had no works of its own, and no means whatever for supplying water for either domestic or municipal purposes. But the city, having allowed the water company for nearly thirty years to divert the quantity of water above mentioned, and to expend vast sums of money upon the faith of a continuance of the right to take said water, could not withdraw its consent within the period of the contract." City of Los Angeles v. Los Angeles City Water Co., 124 Cal. 378, 57 Pac. 210, 571.

The case as now presented shows that, notwithstanding the expiration of the 30-year period mentioned in the contract, the city has not paid or tendered to the complainant company the value of the improve-

ments made in, about, and upon the water works in pursuance of the contract, nor have the respective parties been able to agree upon the value of such improvements. And the bill shows that, although three arbitrators have been appointed, as provided by the contract, for the purpose of ascertaining that value, they have been unable to agree upon the proper amount. Nevertheless the city insists that the complainant is still bound by all the obligations imposed on it by the contract, and the complainant so admits. The city still insists upon the complainant extending its lines of pipe as the needs of the city and its inhabitants require, and the keeping in repair those already in existence; upon its erection of additional fire hydrants; upon the furnishing of the city by the complainant with water for the various municipal uses free of charge, and the furnishing of its inhabitants with water for domestic purposes, as provided in the contract; and the company admits its obligation to do so thereunder, and has continued to perform those obligations ever since the expiration of the 30-year period. Yet the astonishing claim is now and here made on the part of the city that all of its grants and covenants made in consideration of the performance of those obligations by the complainant and its predecessors ceased with the 22d day of July, 1898, with the exception of its agreement to pay the value of the improvements made to the property, notwithstanding the fact that it has not paid or tendered to the complainant the value of those improvements. It ought not to be necessary to cite decisions to show that this contention is wholly without merit. It is a self-evident proposition that it takes at least two parties to make a contract, and it is equally plain that, as long as it exists at all, all parties are bound by its provisions. The fact that one of them is a municipal corporation in no manner alters the case. In Meyer v. Brown, 65 Cal. 589, 26 Pac. 284, the court said:

"It is well occasionally to recall the fact that there is no more reason to permit a municipal government to repudiate its solemn obligations, entered into for value, than there is to permit an individual to do so. Good faith and fair dealing should be exacted of the one equally with the other."

See, also, Zabriskie v. Railroad Co., 23 How. 400, 16 L. Ed. 488; City of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; Illinois Trust & Savings Bank v. City of Arkansas City, 22 C. C. A. 171, 76 Fed. 293; Bates v. Porter, 74 Cal. 224, 15 Pac. 732. As has been said, it was settled by the supreme court of the state in the suit between the complainant and the city that the company is not bound to surrender the property in question until it is paid for the improvements, but is entitled, until payment is made or tendered, to remain in the exclusive possession thereof, notwithstanding the expiration of the 30-year period. This, of course, can only be because the contract secures it in that right. A similar ruling was made by the circuit court of appeals for the Eighth circuit in a case quite similar to the present one, entitled National Water Works Co. v. Kansas City, reported in 10 C. C. A. 653, 62 Fed. 853. There a contract had been entered into between the water company and the city by virtue of an ordinance adopted by the city pursuant to an act of the legislature of the state which, among other things, empowered the city to grant to any person or persons or any corporation the right to erect and operate water

works described in the act, and to accomplish that purpose on such terms and conditions as might be agreed on in a contract therefor, with certain provisions in respect to the approval of the ordinance by two-thirds of the qualified electors of the city, and with the provision that "no grant so made shall confer the right to operate the water-works for any period beyond 20 years from the time of approval of the ordinance as aforesaid; but the grant may be renewed by or pursuant to ordinance approved as aforesaid during the last of such 20 years for another term not exceeding 20 years on terms and conditions specified in the ordinance for the renewal of the grant," and with the further provision, among other things, "that at the expiration of the 20 years, if the grant be not renewed, the city shall purchase and become sole owner of such water-works as aforesaid, and pay therefor a price agreed upon by the parties or ascertained as they may agree, or, if the price cannot be thus fixed, then the city shall pay the fair and equitable value of the whole works, to be ascertained by" a court on the petition of either party filed for the purpose. The contract sued on was made under and by virtue of an ordinance passed pursuant to that statute. The circuit court of appeals (Mr. Justice Brewer delivering the opinion) said, among other things:

"The act of 1873 provided 'that at the expiration of the twenty years, if the grant be not renewed, the city shall purchase.' The ordinance passed in pursuance of that act, and in effect the contract under which the works were created, provided that on a failure to renew the grant at the expiration of 20 years 'the city shall then be required to purchase.' There has been no renewal of the grant. The twenty years have elapsed. The imperative voice of the act and the ordinance is that the city 'shall purchase.' This is not an incidental, directory, or subordinate provision, but one mandatory, vital, and controlling. The thought of the legislature was that the city should own its water works; that, if any arrangement was made with a corporation for their construction and operation, the control and right of such company should be temporary, and the city should become, willingly or unwillingly, at a certain time, the owner. The time fixed was at the expiration of 20 years, with a privilege of extension for another twenty years. This vital, mandatory, and controlling provision compels a decree that the company sell and the city buy. Such was the will of the legislature; such the terms of the act and the ordinance. * * * We dissent in toto from the claim of the city that at the lapse of the twenty years the title of this property, with the right of possession, passed absolutely to it, without any payment or tender of payment, leaving only to the company the right to secure compensation by agreement or litigation, as best it could. Much was said in argument of the relative rights of lessor and lessee to buildings erected during the term of the lease. The city and the company were called 'licensor' and 'licensee,' and it was insisted that, as the right to operate was to cease at the expiration of twenty years, the relation was equivalent to that of lessor and lessee; that full title and right of possession passed instantly to the city, leaving all questions of amount and time and manner of payment to be subsequently determined. Much was said, too, about the rule of construction of public grants; that rule being that the grants are to be construed favorably to the public and unfavorably to the grantee. It is unnecessary to attempt to define the peculiar quality of the title held by the company, nor do we question the rule of construction of public grants; but all contracts involving property rights and obligations between municipalities and individuals must be presumed to be based upon and to recognize the ordinary laws of business transactions, and, if any departure therefrom is contemplated, such departure must be clearly manifested. Now, the familiar and ordinary law of business transactions is that he who parts with title receives, at the time, payment. In other words, payment of price and transfer of property are contemporaneous and concurrent acts.

When it is affirmed that a contract made by a municipality contemplates that he whose money builds and constructs, and therefore establishes title to, property, shall surrender his title and possession without payment, or even the amount thereof determined, the language compelling such a construction must be clear and imperative. There is no such language in either the act or the ordinance. While it is true that the act provides that no grant so made shall confer the right to operate the water works for any period beyond twenty years, yet such provision is no more imperative than the one that at the expiration of the twenty years the city shall purchase and pay therefor. If the city fails to purchase and pay, it acquires no title, no right of possession, to the property of the water works. There is no language which would justify the court in saying that it is clearly expressed that the purpose of this contract and the thought of the legislature were to vest the title and right of possession in the city at the end of twenty years, leaving to future litigation the fixing of the amount and the enforcing of the act of payment. If at the expiration of the twenty years the city had tendered to the company, in payment for the property, an amount admitted or found to be 'the fair and equitable value,' doubtless the right of the city to the possession and future earnings would have immediately accrued, and the present decree would have been based upon such transfer of right, but no such tender was made. In so far, therefore, as the decree of the circuit court attempted to transfer the title and the possession to the city before payment, we are constrained to hold that it was erroneous."

The complainant here being entitled to the exclusive possession and control of the property, as was explicitly adjudged in the former case between it and the city, and that by virtue of the contract in question, what is it to do with it, except to operate the works? And if it operates them, as the city itself insists that it is bound to do, under what possible terms and conditions does it do so, except those specified in the contract? The city insists that the complainant shall continue to keep the works in repair, and it does so. It insists that the complainant must continue to extend its lines and pipes as required by the contract, and the complainant does so. It insists that the complainant shall continue to erect fire hydrants as demanded by the city, and the complainant accedes to the demand. It insists that the complainant shall continue to furnish the city with water for all of its municipal purposes free of charge, and this the complainant continues to do. It insists that the complainant shall furnish the inhabitants of the city with water for domestic purposes, and this the complainant continues to do. To sustain the contention on the part of the city that only the burdens imposed upon the complainant by the contract continue, and that all rights and benefits secured by it thereby ended with the expiration of the 30 years, except the payment by the city of whatever may be ultimately ascertained to be the value of the improvements made to the property by the complainant and its predecessors, would not only violate the first principles of law and equity, but would leave the city at liberty at any time after July 22, 1898, to grant water to another company, with the right to establish a competing system of water works for the supply of the city and its inhabitants with water for domestic and other purposes, which other company would be under the protection of the provisions of the constitution of the state of California, requiring the rates to be fixed for all purposes, including the municipal uses, while the complainant would remain bound to furnish water to the city for those uses free of charge. Such a result would clearly fall directly within the principle the supreme court applied in

refusing to allow the city of Walla Walla to build water works in com-
petition with the Walla Walla Water Company, with which it had
contract rights. The charter of the city of Walla Walla empowered
it to provide a sufficient supply of water, and to erect and maintain
water works within or without the city limits, or to authorize the
erection of the same, for the purpose of furnishing the city or the in-
habitants thereof with a sufficient supply of water, and also to grant
the right to use the streets of the city for the purpose of laying gas
and other pipes intended to furnish the inhabitants thereof with light
or water, to any person or association of persons, for a term not ex-
ceeding 25 years, provided that none of the rights or privileges thereby
granted should be exclusive, nor prevent the council from granting
the same rights to others. The city was also by its charter empowered
to condemn and appropriate so much private property as should be
necessary for the construction and operation of such water works, and
to purchase or condemn water works already erected, or which might
be erected. Under that statute the city, by ordinance, granted to the
water company the right to lay and maintain water mains, etc., for 25
years, reserving to itself the right to maintain fire hydrants and to
flush sewers during the term without charge. It also covenanted not
to erect water works of its own during the life of the contract. The
contract further provided that it should be voidable by the city, so far
as it required the payment of money upon the judgment of a court of
competent jurisdiction, when there should be a substantial failure of
the supply of water, or failure of the company to perform its undertak-
ing. The works were erected pursuant to the provisions of the con-
tract, and the company for a number of years supplied the requisite
water and performed its part of the agreement. Then the city passed
an ordinance to construct its own system of water works, and to issue
bonds therefor, when the water company filed a bill to enjoin the city
from so doing. The court below granted the injunction, and the su-
preme court affirmed its judgment, saying in its opinion, among other
things:

"Nor do we think the contract objectionable in its stipulation that the city
would not erect water works of its own during the life of the contract. There
was no attempt made to create a monopoly by granting an exclusive right to
this company, and the agreement that the city would not erect water works
of its own was accompanied, in section 8 of the contract, with a reservation of
a right to take, condemn, and pay for the water works of the company at any
time during the existence of the contract. Taking sections 7 and 8 together,
they amount simply to this: That, if the city should desire to establish water
works of its own, it would do so by condemning the property of the com-
pany, and making such changes in its plant or such additions thereto as it
might deem desirable for the better supplying of its inhabitants, but that
it would not enter into a direct competition with the company during the life
of the contract. As such competition would be almost necessarily ruinous to
the company, it was little more than an agreement that the city would carry
out the contract in good faith. An agreement of this kind was a natural inci-
dent to the main purpose of the contract; to the power given to the city by
its charter to provide a sufficient supply of water, and to grant the right to
use the streets of the city for the purpose of laying water pipes to any persons
or association of persons for a term not exceeding 25 years. In establishing
a system of water works, the company would necessarily incur a large ex-
pense in the construction of the power house and the laying of its pipes through
the streets; and, as the life of the contract was limited to 25 years, it would

necessarily desire to protect itself from competition as far as possible, and would have a right to expect that at least the city would not itself enter into such competition. It is not to be supposed that the company would have entered upon this large undertaking in view of the possibility that, in one of the sudden changes of public opinion to which all municipalities are more or less subject, the city might resolve to enter the field itself,—a field in which it undoubtedly would have become the master,—and practically extinguish the rights it had already granted to the company. We think a disclaimer of this kind was within the fair intendment of the contract, and that a stipulation to that effect was such a one as the city might lawfully make as an incident of the principal undertaking."

I am unable to see the slightest ground for the contention on the part of the city that it is not as much bound by the terms and. provisions of the contract in question as is the complainant company, and it seems very clear to me that the continued right and obligation on the part of the complainant to operate the works under the contract is necessarily accompanied by the right to collect and appropriate to its own use the water rates therein provided for; for the right to collect and appropriate those rates was the principal consideration that moved the complainant and its predecessors to enter into the contract, to construct the works, and to carry on the business. And that such was the view of the circuit court of appeals for the Eighth circuit in National Water Works Co. v. Kansas City, supra, is clear, not only from its opinion in the case, but from the judgment that it drafted and directed to be entered by the lower court. The defendant city has it in its power to put an end to all of the rights and obligations arising under the contract by paying or tendering to the complainant company the value of the improvements made in, about, and upon the water works as therein provided for. It can do this at any moment that it is ready to make the payment, after the amount has been agreed upon or has been otherwise determined. Until it does so, or offers to do so, all of the covenants and provisions of the contract continue, including that prohibiting the city from establishing lower rates than those charged at the time of the execution of the contract. If these views be correct, it necessarily results from the determination of the supreme court in the former suit between the complainant and the defendant city regarding the ordinance of February, 1897, that the similar ordinance now in question is, as respects the complainant, invalid. And if so, is it not plain that a court of equity only can decree it void, and that a court of equity only is capable of affording the complainant the incidental relief to which it is in that event entitled? If the ordinance be void, and the defendant city, notwithstanding, threatens to, and, unless restrained by the court, will, proceed to enforce its penal provisions, including those contained in it and in the constitution and statute of California, for the forfeiture to the city of the water works in question should the complainant charge other rates than those therein prescribed, and otherwise dispossess the complainant of the property, nothing can be plainer than that a court of equity ought to restrain the city, and its power to do so is quite as clear. Iron Mountain R. Co. v. City of Memphis, 35 C. C. A. 410, 96 Fed. 113; Southwest Missouri Light Co. v. City of Joplin (C. C.) 101 Fed. 23. And if, as is alleged, cer-

tain of the water consumers, acting under such statutory provisions and under the same provisions of the ordinance in question, threaten to, and will, unless restrained, commence similar suits for the forfeiture of the works to the city, and criminal suits against the complainant and those acting for it, as provided in the ordinance, ought not a court of equity to restrain them, also? Undoubtedly so. It is only by such means that the rights of the complainant under the contract can be protected. See decree in National Water Works Co. v. Kansas City, 10 C. C. A. 653, 62 Fed. 853, 867; Singer Sewing Mach. Co. v. Union Buttonhole & Embroidery Co., 22 Fed. Cas. 222 (No. 12,904); Wat. Spec. Perf. Cont. § 109; 1 Beach, Inj. § 444. The revenue laws of the city contain no provisions by which any tax can be levied for the payment of the value of the improvements; the only means of providing such money being the issuance of bonds by the city, first authorized by its qualified electors. City of Los Angeles v. Los Angeles City Water Co., 124 Cal. 368, 376, 377, 57 Pac. 210, 571. The other preliminary relief asked for by the complainant is an order permitting it to collect, pending the suit, from the consumers of water for domestic purposes, the rates established by the defendant city at which other companies than the complainant shall furnish water to the inhabitants of the city for the same purposes. As those rates are shown to be less than those to which, under the views above expressed, the complainant is, under the contract in question, legally entitled, it is manifest that neither the city nor any of its inhabitants can be injured, unless it should turn out on appeal to a higher court that the views here taken are wrong, in which event the city and its inhabitants will be protected by proper bond. But every court must award the relief appropriate to its own conclusions. Holding, as I do, upon the facts averred and confessed, that the ordinance of February 26, 1900, is invalid as respects the complainant, and that it is entitled to collect the rates provided for by the contract of July 22, 1868, so long as the city permits that contract to continue in existence, I would not hesitate to authorize the complainant to collect those rates, pending the determination of the suit, however high they may be, upon the giving of a proper bond, but for the fact that the complainant itself asks only for an order permitting it to collect, pending the suit, the lesser rates established by the defendant for the furnishing of water to the inhabitants of the city for domestic purposes by other companies than the complainant. I entertain no doubt of the power of the court to make the order, and I think it is right and proper that it should be done; for, as has been said more than once, the city insists that the complainant must continue to furnish the water for domestic purposes under the contract, and no one, I apprehend, will seriously contend that it must do so without remuneration. Similar orders were made in the cases of Interstate Commerce Commission v. Louisville & N. R. Co. (C. C.) 101 Fed. 146, and Cotting v. Kansas City Stock-Yards Co. (C. C.) 82 Fed. 850, 857.

For the reasons stated, orders will be entered: (1) Sustaining the exceptions hereinbefore indicated and overruling all of the other exceptions. (2) Overruling the demurrers to the bills, with leave to

the defendants to answer within the usual time. (3) Continuing in force the preliminary injunction heretofore granted against the defendant city, and granting the preliminary injunction asked for against the individual defendants to the supplemental bill, upon the giving by the complainant of a bond in the sum of $20,000, to be approved by the court. (4) Allowing the complainant to collect, pending the suit, or until the further order of the court, the rates established by the defendant city at which other companies than the complainant shall furnish water to the inhabitants of the city for domestic purposes, upon the execution of a bond by the complainant, to be approved by the court, in the penal sum of $50,000, payable to the clerk of this court and his successors in office, for the benefit of whom it may concern, conditioned that in the event it shall be finally determined that the ordinance of February 26, 1900, is valid, the complainant will, on demand, pay to the party or parties entitled thereto all excess of rates collected by it over the charges therein authorized.